

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**03/23/2012**

| | | |
|---|---|---|
| IN RE:<br>**GARY LYNN LAUGHLIN**<br>    Debtor. | §<br>§<br>§<br>§<br>§ | **CASE NO. 09-35842-H4-07**<br><br>**CHAPTER 7** |
| **KYLE WILLIAMS**<br>    Plaintiff,<br><br>v.<br><br>**GARY LYNN LAUGHLIN**<br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **ADVERSARY NO. 09-03451** |

## MEMORANDUM OPINION REGARDING PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
[Adv. Docket No. 1]

### I.   INTRODUCTION

Kyle Williams (Williams), the plaintiff in the above-referenced adversary proceeding,

brought this suit under 11 U.S.C. § 523(a)(2), (4), and (6)[1] to prevent the discharge of the debt

owed to him by Gary Laughlin (the Debtor) totaling $576,785.40. [Adv. Docket No. 1]. The

Debtor and Alan Manring[2] (Manring) were the sole principals of Abatement Incorporated

(Abatement). On behalf of Abatement, the Debtor and Manring entered into an oral contract

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

[2] Manring is not a defendant in this adversary proceeding, but he was a co-defendant with the Debtor in a suit that was brought in state court (discussed in greater detail herein).

with Williams for him to provide certain services to Abatement in exchange for a salary of $1,000.00 per week, plus a percentage of Abatement's net profits from certain projects. Williams alleges that the Debtor kept virtually all of these profits for himself instead of paying a portion of them to Williams; and Williams argues that the Debtor's withholding and spending of these profits constitutes fraud under § 523(a)(2)(A), embezzlement under § 523(a)(4), and willful and malicious injury under § 523(a)(6). The Debtor disagrees.

The Court concludes that Williams is collaterally estopped on his cause of action for fraud pursuant to § 523(a)(2)(A). The Court also concludes that Williams has presented sufficient evidence to satisfy all the elements of embezzlement pursuant to § 523(a)(4) and willful and malicious injury pursuant to § 523(a)(6).

Based upon the entire record, the Court now makes the following written findings of fact and conclusions of law pursuant to Bankruptcy Rule 705(2). To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent any conclusion of law is construed as a finding of fact, it is also adopted as such. Additionally, because the Court made oral findings of fact and conclusions of law on the record at the close of the trial on January 18, 2012, the Court wants to emphasize that if there is any conflict or inconsistency between the written findings of fact and conclusions of law, on the one hand, and the oral findings of fact and conclusions of law, on the other, the former shall govern. Moreover, to the extent that the oral findings of fact and conclusions of law address issues not covered by the written findings of fact and conclusions of law, the former shall supplement the latter.

## II.   FINDINGS OF FACT

1.   Abatement was incorporated in Texas as a construction business and was also doing business as Next Level Construction (Next Level). [Plaintiff's Ex. No. 26].

2

2. The principals and only shareholders, Manring and the Debtor, owned 51% and 49% of Abatement, respectively.

3. The Debtor resides at 9706 Ellen Street, Baytown, Texas.

4. The Debtor was vice-president of Abatement, and Manring was its president.

5. The Debtor had the authority to bind Abatement contractually, write checks on behalf of the business, and purchase materials for the projects on which Abatement worked. Manring also had the authority to bind Abatement contractually, write checks on behalf of the business, and purchase materials.

6. On September 23, 2005, Hurricane Rita caused a substantial amount of property damage along the Gulf Coast of Texas.

7. In late September 2005, Abatement—through the Debtor and Manring as its officers—entered into an oral employment contract (the Contract) with Williams, agreeing to pay Williams $1,000.00 per week and a share in net profits from each project on which he worked.

8. Williams worked on site and compiled estimates for bid proposals. Williams did not have check writing authority, access to company funds, or any authority to bind Abatement contractually. But for Williams's services, Abatement would not have obtained or completed the Texas Instruments project (the TI Project), the Shire Apartments project (the Port Arthur Project), and the Starcrest Apartments project (the Beaumont Project). [3]

9. In 2005, Abatement had gross revenues of $976,038.00, cost of goods sold of $462,204.00, gross profits of $513,834.00, officer compensation of $103,000.00, and a negative net income of $22,523.00. [Plaintiff's Ex. No. 15].

---

[3] These projects involved, among other tasks, removal of asbestos material from apartment buildings. [*See* Defendant's Ex. No. 8]. The Shire Apartments are located in Port Arthur, Texas. The Starcrest Apartments are located in Beaumont, Texas.

10. In 2005, the Debtor split an undetermined amount of the $103,000.00 officer's compensation with Manring.

11. In 2006, Abatement had gross revenues of $3,665,684.00, cost of goods sold of $2,735,302.00, gross profits of $930,382.00, officer compensation of $357,000.00, and a positive net income of $174,835.00. [Plaintiff's Ex. No. 18].

12. Abatement had substantial growth from 2005 to 2006 due to Williams' services. Then, in 2007, Abatement also had substantial positive net income of $449,910.00 due to the services provided by Williams in 2006. [*See* Defendant's Ex. No. 6].

13. Abatement paid the Debtor handsomely as evidenced by his own Statement of Financial Affairs and his Form 1040 from Abatement and Next Level. [Main Case Doc. No. 14; Defendant's Ex. No. 4; Plaintiff's Ex. No. 19].

14. The Debtor's compensation from Abatement in 2006 was $178,500.00. [Defendant's Ex. No. 4; Plaintiff's Ex. No. 19].

15. In 2007, Abatement had gross revenues of $1,318,989.00, officer compensation of $120,400.00, and a positive net income of $449,910.00. [Defendant's Ex. No. 6].

16. The Debtor's Statement of Financial Affairs represents that his net income for 2007, 2008 and 2009 was $31,366.00, $170,797.00, and $89,595.00, respectively. The Debtor represents that he received income from Abatement in 2008 and 2009.

17. Williams fulfilled all of his obligations under the Contract. By doing so, he was instrumental in Abatement's completion of the TI Project, the Port Arthur Project, and the Beaumont Project.

18. Abatement received complete payment for its services rendered and materials provided in the TI Project, the Port Arthur Project, and the Beaumont Project.

19. The monies paid to Abatement for its work on these projects were deposited into Abatement's operating account at JP Morgan Chase Bank in Sugarland, Texas (Chase Bank), account no. 111000614 [*See* Plaintiff's Ex. Nos. 8 & 9].

20. Williams was paid $1,000.00 per week from October 27, 2005 thru October 8, 2006, before being fired in October of 2006.

21. In 2006, Williams started receiving his $1,000.00 payments on checks labeled "Next Level Construction", with the last pay period received labeled October 2, 2006 through October 8, 2006. [Plaintiff's Ex. No. 6]. At some point, either the Debtor or Manring, or both, had the names on the checks switched from Abatement to Next Level, and the monies paid from the three projects worked on by Williams were deposited into the same operating account no. 111000614 at Chase Bank. [Plaintiff's Ex. No. 7; *see also* Plaintiff's Ex. No. 26].

22. Based upon the record at trial, this Court finds that Abatement and Next Level are the same entities.

23. Williams demanded his share of the net profits on multiple occasions during his tenure at Abatement, and the Debtor repeatedly promised Williams that he would receive his share of the net profits relating to these projects on which Williams was working.

24. Williams actually observed the Debtor, on behalf of Abatement, receive payment from a representative of Daniels Company, the general contractor on the Port Arthur Project and the Beaumont Project.

25. Williams actually observed the Debtor withdraw tens of thousands of dollars out of the operating account at Chase Bank, i.e. account no. 111000614.

26. In January 2006, Abatement provided a $2,000.00 loan to Williams, in response to Williams's demands for his share of the net profits, in order to keep Williams from resigning

and to lure him into believing that he really would receive his share of net profits if only he would stay on board at Abatement.  Contrary to what the Debtor testified, this was the only loan that Abatement ever made to Williams.

27. In June of 2006, Williams received two checks from Abatement for $7,055.00, and $2,000.00 [Plaintiff's Ex. Nos. 8 & 9].  These two checks represented a portion of the net profits of the projects on which Williams was working.  Contrary to what the Debtor testified, the two checks did not represent loans made by Abatement to Williams.  Based upon the record at trial, this Court finds that Abatement, through the Debtor, delivered the checks to Williams to ensure that he would stay on the jobs and continue to provide his valuable services and to lure him into believing that he really would receive his promised share of net profits on the projects on which he was working.

28. The Court finds that the $7,055.00 check and the $2,000.00 check represented a portion of the net profits given to Williams and were not loans, because Abatement categorized these payments as income, and not loans, by giving Williams a Form 1099. [Plaintiff's Ex. Nos. 8, 9 & 10].

29. Williams continuously threatened the Debtor that he would resign because he was in financial straits without his share of net profits.  Williams needed the net profits to help meet the substantial financial burden of caring for his wife's multiple sclerosis treatments.  The Debtor continuously promised Williams that he would receive his entire share of net profits to keep Williams from resigning, but the only net profits that Williams ever received were the two checks totaling $9,055.00.

30. During Williams' tenure at Abatement, the Debtor and Manring, each of whom were signatories on Abatement's operating account at Chase Bank, made withdrawals from this

account at will and used the funds for their personal use–such as acquiring new automobiles–
in order to divert from Williams his share of the net profits of the three projects of which he
was working.

31. In October 2006, Abatement suddenly fired Williams.  Manring actually did the firing, but he
did so with the Debtor's knowledge and approval.  On October 23, 2006, Williams sent a
demand letter to the Debtor asking for an accounting of his share of profits owed to him.
[Plaintiff's Ex. No. 14].  Williams did not receive a response.

32. In late 2006, Williams sued the Debtor, and the suit was styled *Kyle Williams vs. Abatement
Inc., Alan Manring, and Gary Laughlin*, Cause no. 2006-77415, in the 127th District Court of
Harris County, TX (the State Court Lawsuit).  [Plaintiff's Ex. No. 3].

33. On February 3, 2009, the State Court Lawsuit was tried to a jury.  [Plaintiff's Ex. No. 3].

34. The jury in the State Court Lawsuit answered seven questions [Plaintiff's Ex. No. 4]:

   a. Did Abatement and Williams agree that Williams would receive a percentage of the
      profits from the TI Project, the Port Arthur Project, and the Beaumont Project?  The jury
      answered yes.

   b. What percentages did Abatement and Williams agree upon?  The jury answered that
      Williams would receive 20% of the profits from the TI Project, 33 1/3% of the profits
      from the Port Arthur Project, and 33 1/3% of the Beaumont Project.

   c. Did Abatement fail to comply with the agreement?  The jury answered yes.

   d. What amount of profits was made from the projects?  The jury answered that the TI
      Project yielded $26,064.00, the Port Arthur Project yielded $1,325,334.00, and the
      Beaumont Project yielded $91,161.00.

   e. Did the Debtor act directly or indirectly in the interest of Abatement in relation to

7

Plaintiff Williams?  The jury answered yes.

f.  Did Manring act directly or indirectly in the interest of Abatement when dealing with Williams?  The jury answered yes.

g.  What are the reasonable attorney's fees for Williams's counsel?   The jury answered $35,000.00 for trial and preparation, $3,500.00 in the event of an appeal to the Court of Appeals, and $3,500.00 in the event of an appeal to the Supreme Court of Texas.

35.  On March 11, 2009, the Harris County District Court (the State Court) awarded Williams damages of $477,380.47 to bear at the interest rate of 5% per annum beginning December 6, 2006, equating to $65.39 daily.  [Plaintiff's Ex. No. 5].  The State Court also awarded attorney's fees of $42,000.00, which also bears an interest rate of 5% per annum to start from the date of judgment until paid.  [*Id.*].  The total amount of the judgment was $576,785.40, and this judgment imposed joint and several liability on the Debtor, Manring, and Abatement (the Judgment).  [*Id.*].

36.  On August 7, 2009, the Debtor filed a Chapter 7 petition (the Petition Date).  [Main Case Doc. No. 1].

37.  After the Debtor filed a Chapter 7 petition, Williams filed a Proof of Claim for $576,785.40.  [Plaintiff's Ex. No. 5].  This figure represented the amount owed under the Judgment, including interest accrued from the date of judgment until the date of the filing of the Chapter 7 petition.

### III.   CREDIBILITY OF THE WITNESSES

Four witnesses testified during the trial: (1) Kyle Williams, the Plaintiff; (2) Renee Williams, the Plaintiff's wife; (3) Charles Manring; and (4) Gary Laughlin, the Debtor/Defendant.  Set forth below are the Court's findings concerning the credibility of these

8

witnesses.

A. <u>Kyle Williams</u> (the Plaintiff)

      Williams testified throughout the trial on a variety of issues.  This Court finds Williams to be a very credible witness, and gives substantial weight to his testimony.

B. <u>Renee Williams</u> (the Plaintiff's wife)

      Ms. Williams testified at the trial about her husband's dealings with the Debtor and about her own communications with the Debtor.  This Court finds Ms. Williams to be a very credible witness, and gives substantial weight to her testimony.

C. <u>Gary Laughlin</u> (the 49% owner of Abatement)

      The Debtor testified at trial on numerous issues.  The Court finds that the Debtor is not a credible witness, and gives little weight to his testimony.  The Debtor frequently provided inconsistent testimony and also changed his testimony when he was caught being inconsistent, as evidenced by the following examples:

(1) Though the Debtor first testified that Abatement and Next Level did not own any vehicles [June 7, 2011 Tr. 23:4-5], he later denied making such a statement and then testified that Abatement owned a 1999 Ford Pickup truck. [June 20, 2011 Tr. 55:8-23].

(2) At one point, the Debtor testified that he had no control over the financials of Abatement, nor did he have access to its operating account at Chase Bank. [June 7, 2011 Tr. 30:18-23].  However, the Debtor had previously testified that he was the person who did the purchasing of equipment on behalf of Abatement [June 7, 2011 Tr. 28:10-14].  Moreover, he later admitted that he "was a signer" on checks [June 7, 2011 Tr. 31:2-4], that he deposited checks into the operating account at Chase Bank [June 7, 2011 Tr. 31:1], and that he gave himself distributions and bonuses.  [June 7, 2011 Tr. 32:10-12].

9

(3) The Debtor initially testified that Manring "handled all the money" in Abatement, including making all large transactions [June 7, 2011 Tr. 33:4-13], but later admitted that he (and not Manring) sold one of Abatement's automobiles.  [June 20, 2011 Tr. 58:4-7].

(4) The Debtor initially testified that he "never went to the bank and pulled out money [from the operating account at Chase Bank] and bought anything."  [June 7, 2011 Tr. 31:7-11].  However, he later admitted that he pulled money out of the operating account at Chase Bank to purchase automobiles for "the Beaumont job."  [June 20, 2011 Tr. 81:5-9].

(5) The Debtor testified that he knew that Williams had a right to 20% of the profits of the TI Project [June 7, 2011 Tr. 27:8-12], but later testified that he never paid Williams any of the profits because he (i.e. the Debtor) "didn't handle the money." [4]  [June 7, 2011 Tr. 30:15-20].

(6) The Debtor testified that he made no promise to share one-third of the profits from the Beaumont Project with Williams [June 7, 2011 Tr. 26:18—27:1-12] and that the checks totaling $9,055.00 he gave to Williams were loans [June 7, 2011 Tr. 37:4-8], but the 2006 Form 1099 Abatement gave to Williams shows that the checks were given to Williams as a small portion of his share of the profits.  [Plaintiff's Ex. No. 10].

(7) The Debtor initially testified that he did not have any ownership interest in any business owned by Kamal Hussein[5]. [June 7, 2011 Tr. 22:6-16].  He later admitted that he has a 51% ownership interest in Bay Area Cycles, which operates out of a building owned by Hussein. [June 20, 2011 Tr. 71:2-3].

(8) The Debtor initially testified that he, his father, and Abatement never stored anything in

---

[4] *See infra* (2), where the Debtor indicated that he did have access to the operating account at Chase Bank and paid himself distributions and bonuses out of this account.

[5] Kamal Hussein is an individual with whom the Debtor had—and apparently still has—a business relationship.

Hussein's building [June 20, 2011 Tr. 73:25—74:1-12]. He later testified that Hussein

had stored his grandmother's Lincoln Continental in the building. [June 20, 2011 Tr.

75:14-21]. Upon further questioning, the Debtor admitted that the Lincoln Continental

was his father's vehicle [June 20, 2011 Tr. 75:22-25], but soon afterwards, he declared

that the automobile actually belonged to his grandfather. [June 20, 2011 Tr. 76:1-5].

(9) The Debtor testified that the utility trailer listed on his Schedules was his own [June 20,

2011 Tr. 66:21—67:1-6], but according to the title record, Abatement is the title holder of

this trailer. [Plaintiff's Ex. No. 47].

(10) The Debtor testified that his 1999 Ford pickup "was a piece of junk" because it had been

"all smashed up" in an accident, and that he no longer had it. [June 20, 2011 Tr. 57:7-

16]. However, Plaintiff's Exhibit No. 46-1 is a photograph that shows this truck to be in

good condition and parked next to the store in which the Debtor has 51% ownership.

There has been no proof that an accident occurred or that an insurance claim was ever

made that would support the Debtor's testimony that this truck is "all smashed up" and "a

piece of junk."

(11) The Debtor testified that after the Ford pickup truck had been damaged in an accident,

he sold it to a "Hispanic man" whose name he did not know. [June 20, 2011 Tr. 58:4-

13]. However, Plaintiff's Exhibit No. 46, Page 2 shows that according to the vehicle's

title history, the Ford pickup truck is still registered under Abatement's name.

Furthermore, the Debtor provided no proof of sale of this vehicle.

Based on the foregoing examples, which still do not comprise the full extent of the

Debtor's inconsistent or downright contradictory testimony, the Court finds that the Debtor is not

a credible witness and gives very little weight to his testimony. In a nutshell, the Debtor will say

anything if he believes it will help his defense, and he could not care less about the importance of the oath.

D. <u>Charles Alan Manring</u> (the 51% owner of Abatement)

Manring testified at trial on numerous issues.  This Court finds that Manring is not a credible witness, and gives little weight to his testimony.  As just one example of Manring's poor credibility and character, this Court refers to a recorded conversation between Williams and Manring where Manring blithely reneges on a promise formerly made to Williams:

Williams: "I realize that, but you told me I could keep the computer…"
Manring: "Well ya, we did change our mind."  [Defendant's Ex. No. 11].

## IV.   CONCLUSIONS OF LAW

### A.   Jurisdiction, Venue, and Constitutional Authority to Sign a Final Judgment

1. <u>Jurisdiction</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (I), and (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

2. Venue

Venue is proper pursuant to 28 U.S.C. § 1409.

3. Constitutional Authority to Enter a Final Judgment

The Supreme Court's decision in *Stern v. Marshall* recognized significant limitations on bankruptcy courts' authority to enter a final order. *Stern v. Marshall*, 131 S.Ct. 2594 (2011). The undersigned bankruptcy judge therefore provides analysis of his constitutional authority to enter a final judgment in this adversary proceeding.

In the first instance, the Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that therefore this Court has the authority to enter a final judgment. In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant. Here, a creditor (i.e. Williams) has filed suit under an express bankruptcy statute, § 523(a)(2), (4), and (6), requesting this Court to issue a judgment that the debt owed to Williams is nondischargeable. This suit is therefore based on an express bankruptcy statute; indeed, the requested relief is unique to the Code and could never be obtained under state law. For these reasons alone, this Court concludes that *Stern* is inapposite, and therefore it has constitutional authority to enter a final judgment in this dispute.

Alternatively, to the extent that *Stern* applies, this Court concludes that the "public rights" exception articulated in *Stern* applies to this suit; and, therefore, this Court has constitutional authority to enter a final judgment. As noted above, *Stern* concerned a bankruptcy court's authority over a debtor's state common law counterclaim to a proof of claim filed against the estate. The Supreme Court held that a bankruptcy court may not constitutionally enter a final judgment over a counterclaim that would not necessarily be resolved by the resolution of the

13

proof of claim. *Id.* at 2618. Stated differently, the counterclaim did not constitute a "public rights" dispute. *Id.* at 2615. Although public rights disputes may be decided by non-Article III tribunals, public rights disputes must involve rights "integrally related to a particular federal government action." *Id.* at 2611–13. Entering a final judgment with respect to the common law counterclaim would be an impermissible exercise of the judicial power of the United States. *Id.* at 2615.

The broader applicability of the Court's decision remains unclear. Other types of disputes frequently decided by bankruptcy courts may also require adjudication by an Article III court. *Granfinanciera, S.A. v. Nordberg*, for example, held that the adjudication of a fraudulent transfer claim against a creditor who had not filed a proof of claim did not fall within the public rights exception. 492 U.S. 33, 54–55, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). The Court's authority over matters involving state-law causes of action is particularly questionable.

The Court concludes, however, that it may exercise authority over essential bankruptcy matters under the "public rights" exception. Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal. 473 U.S. 568, 593, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Cent. Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 363–64, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006); *see N. Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public

14

right' "). *But see Stern,* 131 S.Ct. at *2614 n. 7 ("We noted [in *Granfinanciera* ] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.' ").

This suit involves a dispute over the Debtor's discharge. The right to a discharge is established by the Bankruptcy Code and is central to the public bankruptcy scheme. *See Katz,* 546 U.S. at 363–64, 126 S.Ct. 990 (including a discharge among the "[c]ritical features" of a bankruptcy proceeding). A debtor, upon surrendering his or her assets for distribution in a Chapter 7 case, is entitled to a discharge. *See Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440, 447, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004) ("A bankruptcy court is able to provide the debtor a fresh start in this manner ... because the court's jurisdiction is premised on the debtor and his estate, and not on the creditors."). Determinations of whether a debtor meets the conditions for a discharge are integral to the bankruptcy scheme, and the Bankruptcy Court has the authority to make such determinations.

Similarly, the Bankruptcy Court has the authority to determine when the statutorily established right to a discharge does *not* apply. Unless a creditor proves the applicability of an exception to discharge, the creditor is entitled to collect only against the bankruptcy estate. *Tower Credit, Inc. v. Gauthier (In re Gauthier),* 349 Fed.Appx. 943, 945 (5th Cir.2009) (per curiam) ("[T]he creditor claiming nondischargeability . . . has the burden of proving, by a preponderance of the evidence, that the debt is exempt from discharge."). When a bankruptcy court determines the extent of a creditor's nondischargeable claim, the court simply decides that a particular creditor is entitled to something more than the creditor would otherwise get out of the bankruptcy bargain. Such determinations are inextricably tied to the bankruptcy scheme and involve the adjudication of rights created by the Bankruptcy Code. This adversary proceeding therefore falls within the Bankruptcy Court's authority, and the judgment entered is a final order.

**B.  The Debtor's Motion for Summary Judgment Was Granted in Part Because Williams is Collaterally Estopped From Prosecuting His Cause of Action Under § 523(a)(2)(A)**

Prior to trial, this Court granted in part and denied in part the Debtor's Motion for Summary Judgment (the Motion).  The Debtor contended that Williams is barred from prosecuting this adversary proceeding due to principles of res judicata and collateral estoppel; that is the Debtor argued that the trial held in the State Court Lawsuit bars Williams from bringing this adversary proceeding.  The Court denied the Motion as to the claims under §§ 523(a)(4) and (a)(6), because Williams's petition in the State Court Lawsuit did not allege embezzlement, and the issue of willful and malicious injury was not put to the jury and therefore was not fully litigated.  Accordingly, neither collateral estoppel nor res judicata applies, and Williams is entitled to pursue these claims in this adversary proceeding.  This Court, however, granted the Motion with respect to the § 523(a)(2)(A) claim for fraud because based upon the oral findings of fact and conclusions of law made by the trial court judge in the State Court Lawsuit, Williams is collaterally estopped from relitigating the specific type of fraud described in § 523(a)(2)(A).  Because this Court did not memorialize its oral findings or conclusions as to its ruling on the § 523(a)(2)(A) portion of the Motion, it does so now.

The Fifth Circuit has held that under Texas law, a party who seeks to invoke the doctrine of collateral estoppel must establish: "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *In re Park*, 271 Fed.Appx. 398, 401 (5th Cir. 2008).  In the suit at bar, only the first element is in dispute.

1.  The Facts Were Fully and Fairly Litigated in The Prior Action as to the Fraud Claim

Williams had a previous opportunity to fully and fairly litigate his fraud claim in the State Court Lawsuit because (a) the fraud claim pled in the State Court Lawsuit was the same type of

16

fraud referenced in § 523(a)(2)(A); and (b) after the evidence was closed in the State Court

Lawsuit, the State Court granted the Debtor's oral motion for a directed verdict based on

Williams' failure to establish all of the elements required for fraud.

> (a) *The Fraud Claim Pled in the State Court Lawsuit is the Same Type of Fraud Referenced in § 523(a)(2)(A).*

In order to establish a non-dischargeable claim for fraud under § 523(a)(2)(A), a plaintiff

must show that: (1) a representation was made; (2) the representation was knowingly false; (3) it

was made with the intent to deceive the plaintiff; (4) the plaintiff actually and justifiably relied

on it; and (5) the plaintiff sustained a loss as a proximate result of its reliance. *In re Mercer*, 246

F.3d 391, 403 (5th Cir. 2001). Similarly, under Texas law, to prevail on a claim for fraud, a

plaintiff must show that: (1) a material representation was made; (2) the representation was false;

(3) when the representation was made, the defendant knew it was false or made it recklessly

without any knowledge of the truth; (4) the defendant made the representation intending that the

plaintiff act on it; (5) the plaintiff actually relied on it; and (6) the plaintiff incurred damages.

*Forney 921 Lot Development Partners I, L.P. v. Paul Taylor Homes, Ltd. et al.*, 349 S.W.3d 258,

270 (Tex. App.—Dallas, 2011) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs &*

*Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998)).

In his petition filed in the State Court Lawsuit, Williams alleged the following claim for

fraud: "At the time of making the promise to pay Plaintiff…Alan Manring and Gary Laughlin,

acting on behalf of themselves and/or as agents for Abatement, never intended to perform. They

knew the representation to the Plaintiff to pay him a percentage of the profits was material in

inducing Plaintiff to enter into the agreement to perform services, they knew the representation

was false and they made the representation with the intent that the Plaintiff act on it." [Plaintiff's

First Amended Original Petition, p.2, ¶ 9; *see also* Finding of Fact Nos. 23 & 26]. Because the

elements of fraud under § 523(a)(2)(A) are essentially identical to the elements required to establish fraud under Texas law, Williams did indeed plead a fraud claim in the State Court Lawsuit that is the same type of fraud referenced in § 523(a)(2)(A).

      (b) *The State Court Granted the Debtor's Directed Verdict on the Issue of Fraud*

Under Fifth Circuit case law, collateral estoppel applies even to an issue that resulted in a default judgment in state court. *In re Garner*, 56 F.3d 677 (5th Cir. 1995); *In re Pancake*, 106 F.3d 1242 (5th Cir. 1997); and *In re Harrison*, 180 Fed.Appx. 485 (5th Cir. 2006). The reviewing court "is required to fully investigate a record and to determine if a default judgment should have preclusive effect." *Harrison*, 180 Fed.Appx. 485 at 488 (holding that "a hard look at the facts in this case shows that the issues were fully and fairly litigated—Harrison was aware of his court date, yet he chose not to appear.").

In the suit at bar, there is no default judgment at issue. In contrast to the plaintiffs in *Garner*, *Pancake*, and *Harrison*—all three of whom took default judgments—Williams actually fully litigated his fraud claim in the State Court Lawsuit during a jury trial. During this trial, after Williams rested in his case in chief, the Debtor's counsel orally moved for a partial directed verdict on the issue of fraud against the defendants on the ground that there was no evidence to support a finding of fraud. [Adv. Doc. No. 22-5, 48:19-24]. The State Court carried the oral motion; further evidence was taken; and at the close of the evidence, the State Court concluded that Williams had failed to establish all of the elements for fraud:

The Court: I think 61.001(4)(b) applies.
Mr. Phillips [Counsel for Williams]: If it applies, then I probably don't need the fraud claim.
The Court: I don't think you proved your fraud claim, so I'm going to go ahead and grant your motion for fraud.
Mr. Phillips: You just convinced me that I didn't need the fraud claim.
The Court: Not that you proved it. I don't think you got—I don't think you met the legal sufficiency standard. Does that make sense? I'm not taking their choice—their job. I don't believe you presented any evidence on at least one element of that claim. . .[Adv. Doc. No. 22-5,

139:16-25—140:1-4].

The State Court therefore granted the directed verdict as to the fraud claim.

Because Williams seeks to litigate the same fraud issue in the current adversary proceeding that was fully and fairly litigated in the State Court Lawsuit, Williams is collaterally stopped from trying the issue of fraud under § 523(a)(2)(A).  Accordingly, this Court granted the Debtor's motion for summary judgment with respect to § 523(a)(2)(A).  Under the collateral estoppel doctrine, Williams may not recover under § 523(a)(2)(A).  Williams may, however, recover under the other two sections as discussed below.

## C.  Williams is Entitled to Obtain a Judgment Under §§ 523(a)(4) and (a)(6)

Based upon the jury's answers in the State Court lawsuit, there is no question that: 1) Abatement and Williams agreed that Williams would receive a percentage of the profits from the TI Project, the Port Arthur Project, and the Beaumont Project; 2) Williams would receive 20% of the profits from the TI Project, 33 1/3% of the profits from the Port Arthur Project, and 33 1/3% of the profits from the Beaumont Project; 3) Abatement failed to comply with the agreement; 4) the TI Project yielded profits of $26,064.00, the Port Arthur Project yielded profits of $1,325,334.00, the Beaumont Project yielded profits of $91,161.00; 5) the Debtor acted directly or indirectly in the interest of Abatement in relation to Williams; 6) Manring acted directly or indirectly in the interest of Abatement when dealing with Williams; and 7) the reasonable attorney's fees for Williams was $35,000.00 for trial and preparation, $3,500.00 in the event of an appeal to the Court of Appeals, and $3,500.00 in the event of an appeal to the Supreme Court of Texas.  [Finding of Fact No. 34].  The Judgment is based on these findings.  There is also no question that the amount which the Debtor owes to Williams as of the Petition Date is $576,785.40.  [Finding of Fact Nos. 35, 36 & 37].  The question is whether this debt is

19

dischargeable or non-dischargeable. It is non-dischargeable under § 523(a)(4) if Williams has

proven that the Debtor embezzled the monies that should have gone to Williams pursuant to the

Contract. It is non-dischargeable under § 523(a)(6) if Williams has proven that the Debtor

willfully and maliciously injured Williams by not paying him his share of the net profits.

1. Williams has Proven that the Debtor Embezzled Williams's Share of Net Profits

A discharge under section 727 does not discharge an individual debtor from any debt

arising from fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4). Williams pleaded all three of these grounds in his complaint initiating

this adversary proceeding, but here, he can only prevail on the embezzlement theory. The

Debtor did not stand in a fiduciary capacity to Williams, as the Contract by no means imposed

such a high duty on the Debtor. *See, e.g., Crim Truck & Tractor Co. v. Navistar Int'l Trans.

Corp.*, 823 S.W.2d 591, 593-95 (Tex. 1992) (discussing when a fiduciary duty arises, and noting

that the fact that one businessman trusts another in a contractual relationship does not rise to a

fiduciary duty). Hence, this ground of recovery is of no avail. Nor does larceny apply because

the profits received from the three projects were paid to the proper entity, i.e. to Abatement or

Next Level. [Finding of Fact No. 18]; *In re Davenport*, 353 B.R. 150, 199 (Bankr. S.D. Tex.

2006) (holding that larceny applies only when a debtor unlawfully comes into possession of the

funds at the outset). So, the only way Williams can prevail under § 523(a)(4) is if he can show

that the Debtor embezzled the profits that were owed to him (i.e. Williams). To prevail on a

claim of embezzlement under § 523(a)(4), Williams must show that: 1) there was an

appropriation of funds by the debtor that did not belong to him, 2) used for the debtor's own

benefit, 3) with fraudulent intent. *In re Davenport*, at 150; *see also In re Holdaway*, 388 B.R.

767 (Bankr. S.D. Tex. 2008). Williams has the burden of proof on each element of

embezzlement by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279 (1991).

(a) *Williams Held an Interest in the Profits that were Appropriated by the Debtor*

The first issue is whether the Debtor appropriated net profits that belonged to Williams, i.e. the 20% share of profits from the TI Project, the 33 1/3% share of profits from the Port Arthur Project, and the 33 1/3% share of profits from the Beaumont Project.  [*See* Finding of Fact No. 34].  This Court first discusses whether Williams held an interest in the net profits promised by the Debtor, and then reviews whether the Debtor appropriated these profits for his own personal use.

It is a deep-rooted rule that contingent interests can take effect as present contracts that are "enforceable when the assigned expectancies or possibilities [happen]".  *Christopher v. Davis*, 284 S.W. 253, 257 (Tex. Civ. App. 1926).  This rule is prevalent in *Stowell*, where the plaintiff sought to enforce a contract that promised a one-half interest in net rentals arising from two leaseholds.  *Stowell v. Macandrews & Forbes*, 956 F.2d 96 (5th Cir. 1992).  Using the rule from *Davis*, the Fifth Circuit explained that the agreement was a mere promise to pay that would convert into an enforceable ownership interest as soon as the rental payments were received.  *Id.* And, although the Fifth Circuit did not find an ownership interest in *Davis* because the net rentals were uncollected, it is clear that the promise to pay would have converted into an ownership interest to which the plaintiff would be entitled had the rentals been collected.  While the dispute before this Court does not include real property, the proposition still stands that the doctrine of equity "will give effect to assignments of every kind of future and contingent interests and possibilities in real and personal property when made upon a valuable consideration."  *See Davis*, 284 S.W. 253, at 257.  Indeed, the court in *Berthelot* held that a personal property interest in net profits was an asset that belonged to a party holding it.

21

*Berthelot v. Brinkmann,* 322 S.W.3d 365 (Tex. App. Dallas—2010).

Here, Williams actually observed the Debtor receiving payment from Daniels Contruction Company, the general contractor, for the construction services rendered by Abatement. [Finding of Fact No. 24]. The moment Abatement received payment for the services and materials that it provided, i.e. a "future expectancy or possibility", Williams's contractual promise to receive net profits immediately became an ownership interest. Further, Williams was given two checks of $7,055.00, and $2,000.00 [Finding of Fact No. 27], separate from his normal salary of $1,000.00 per week in June 2006 [Finding of Fact No. 20]. These checks represented a portion of the net profits–and not a loan as the Debtor argues–because Abatement categorized these payments as income on a Form 1099 given to Williams. *Jordan v. C.I.R.*, No. 14018–04, 2006 WL 1228587, at *3 (T.C. 2006), *aff'd*, 226 Fed.Appx. 15, at *16 (1st Cir. 2007); [Finding of Fact No. 28]. And, while it may not matter that Williams received a portion of the promised net profits to determine when an ownership interest arose, it clearly evidences that the Debtor, through Abatement, was beginning to fulfill this contractual obligation to Williams under the Contract. This Court concludes that once Williams entered into the Contract, the promise to distribute future net profits was a contingent interest that manifested into an ownership interest held by Williams once Abatement received payment from its clients.

After Williams received the $9,055.00 [Finding of Fact No. 27], there is no question that the Debtor appropriated the remaining net profits away from Williams. [Finding of Fact No. 30 & 34]. The Debtor had check writing authority, control over the operating account at Chase Bank, and withdrew monies from this account for his personal use. [Finding of Fact Nos. 5 & 30]. Williams actually observed the Debtor withdraw tens of thousands of dollars from the operating account at Chase Bank. [Finding of Fact No. 19 & 25]. According to the Debtor's

own Statement of Financial Affairs, the Debtor's 2006 income from Abatement was $178,500.00. [Finding of Fact No. 14]. His Statement of Financial Affairs also includes 2007 income in the amounts of $201,049.00 and $155,317.00. [Finding of Fact No. 16]. Additionally, it is not required to prove that the Debtor profited dollar by dollar in an amount equal to that lost by Williams. In *Hayden*, the debtor "secretly took funds, constituting part of the creditor's individual share of the sale of proceeds. The debtor disregarded the creditor's wishes on proper dispersal of the funds and instead used the funds to improve the finances." *In re Hayden*, 248 B.R. 519 (Bankr. N.D. Tex. 2000). The court in *Hayden* "[rejected] the implication . . . that the appropriation requirement for embezzlement under section 523(a)(4) demands a showing that the debtor individually profited in an amount equal to that lost by the creditor." Thus, this Court concludes that the Debtor appropriated net profits in which Williams held an interest. Therefore, Williams has satisfied the first requirement of embezzlement.

(b) *The Debtor Used the Appropriated Profits for his Own Benefit*

The second issue is whether the Debtor used the funds for his own benefit. As evidenced by his own testimony and his Statement of Financial Affairs, the Debtor paid himself handsomely from the profits generated by the projects on which Williams worked. [Finding of Fact No. 13]. Among other things, the Debtor bought cars with the money he withdrew from the operating account at Chase Bank. [Finding of Fact No. 30]. Williams was hired in late 2005. [Finding of Fact No. 7]. But for Williams's work, Abatement would not have obtained or completed these three projects that financially benefited the Debtor. [Finding of Fact Nos. 8 & 17]. In 2006, after Williams was on board at Abatement, the Debtor's income sky-rocketed to $178,500.00 based upon the net profits flowing into Abatement from Williams's work on the three projects. [Finding of Fact Nos. 11, 12 & 14]. In sum, this Court concludes that the Debtor

used the appropriated net profits for his own benefit; Williams has therefore satisfied the second requirement of embezzlement.

(c) <em>The Debtor acted with Fraudulent Intent</em>

The third issue is whether the Debtor intended to defraud Williams.[6] Fraudulent intent, as an element of embezzlement, is determined by: 1) whether the debtor alone had access to the creditor's money; 2) whether the debtor had knowledge that the creditor wanted his money returned; 3) whether the debtor had accounted to the creditor for the funds; and 4) whether an accounting had been made for the funds. *Davenport* at 201; *Pool v. Johnson*, 2002 U.S. Dist. LEXIS 6613 (N.D. Tex. Apr. 15, 2002). The court in *Buhay* described the fraudulent intent element of embezzlement where the debtor is aware the person wants the funds but takes them for himself without an accounting. *In re Buhay*, 77 B.R. 561, 563 (Bankr. W.D. Tex. 1987). Rarely will a debtor take the stand and admit that he intended to defraud a creditor; thus, it is said that fraud thrives in the shadows. Stated differently, fraudulent intent can be proven by circumstantial evidence. *Brady v. McAllister*, 101 F.3d 1165 (6th Cir. 1996).

First, as between the Debtor and Williams, only the Debtor had access to the funds which Abatement received for the construction projects. [Finding of Fact No. 8]. The Debtor was vice-president and one of the principals of Abatement who had check writing authority. [Finding of Fact Nos. 2, 4 & 5]. Williams was a mere employee who could only rely on the Debtor's actions as principal to receive the funds. [Finding of Fact No. 8]. There is no question that the Debtor

---

[6] Fraudulent intent, as an element of embezzlement, differs from the type of fraud pled under § 523(a)(2)(A). One bankruptcy court very aptly delineates the difference: "The facts clearly reveal that [the debtor] purposefully and intentionally engaged in a series of improper transfers of SMC's monies through the use of multiple accounts to embezzle client's monies for his own personal benefit. Nevertheless, [the plaintiff] did not sustain its burden of proving by the preponderance of the evidence that [the debtor] had the fraudulent intent at the time he, through JFA, persuaded SMC to entrust its monies with JFA. It seems to be a very fine point, but when the intent to divert a customer's funds is formed after the customer has entrusted those monies, that supports only the conclusion of law that somebody acting as [the debtor did] engaged in embezzlement, but not common law fraud." *See In re Nappy*, 269 B.R. 277, 299 (Bankr. E.D.N.Y., 1999) (emphasis added).

had access to money in the operating account at Chase Bank. [Finding of Fact Nos. 2 & 5]. Second, the Debtor was well aware that Williams wanted his interest in the profits. [Finding of Fact Nos. 23, 26 & 29]. Williams continually inquired about his share of the profits owed to him. [*Id.*]. Williams went as far as threatening to quit the business, because he was in financial trouble without the profits owed to him. [Finding of Fact No. 29]. In January 2006, Abatement gave Williams a $2,000.00 loan in an attempt to keep Williams from leaving the business. [Finding of Fact No. 26]. It is unreasonable to argue that the Debtor was unaware that Williams wanted his share of the profits. Third, the Debtor failed to give Williams an accounting of the net profits owed to Williams. In October 2006, Williams sent a letter to the Debtor asking for an accounting of his share of profits owed to him. [Finding of Fact No. 31]. Williams did not receive a response. [*Id.*]. Finally, the Debtor failed to account for the net profits. An accounting was never made for the net profits transferred from Abatement to Next Level, or for the net profits withdrawn from the operating account at Chase Bank by the Debtor. [*See* Finding of Fact Nos. 21 & 31].

The court in *Johnson* held there is enough evidence to prove fraudulent intent when a debtor knowingly appropriates funds away from a person in financial straits. *Johnson*, at 9-10. Thus, this Court concludes that the Debtor intended to defraud Williams. Therefore, Williams has satisfied the final requirement of embezzlement.

2. Williams has Proven That the Debtor Committed Willful and Malicious Injury by Taking Williams's Share of Net Profits

In the alternative, the Debtor committed willful and malicious injury for the same reasons found in *Davenport*. A discharge under section 727 does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. 11 U.S.C. § 523(a)(6). Under the Fifth Circuit's *Miller* test, if the actions were

25

substantially certain to, or did, cause harm to Williams, the actions constitute willful and malicious injury. *In re Miller*, 156 F.3d 598, 604 (5th Cir. 1998).

In this suit, the Debtor knew that Williams was in extreme financial straits [Finding of Fact No. 29]; therefore, the Debtor's absconding with Williams's share of the net profits was necessarily willful and malicious conduct which injured Williams. *In re Davenport*, 353 B.R. 150 at 202. Moreover, Williams's wife had multiple sclerosis, which was, and still is, a significant financial burden on Williams. [Finding of Fact No. 29]. The Debtor was aware of this fact. [Finding of Fact No. 29]. Accordingly, the Debtor's pilfering of Williams's share of the net profits necessarily undermined Williams's ability to properly care for his very ill wife. In sum, the Debtor's taking and spending of the profits promised to Williams, while knowing that Williams was in extreme financial straits and that his wife had multiple sclerosis, constitutes willful and malicious injury. Therefore, the debt is not dischargeable under § 523(a)(6).

## V. CONCLUSION

This Court concludes that Williams has proven by a preponderance of the evidence that the Debtor embezzled the net profits owed to him and, additionally, willfully and maliciously injured Williams by doing so. Because Williams has succeeded in meeting his burden of proof, the debt owed to him, which totals $576,785.40, is non-dischargeable.

A judgment consistent with these proposed findings of fact and conclusions of law has already been entered on the docket.

Signed this 23rd day of March, 2012.

Jeff Bohm
United States Bankruptcy Judge